)                                    )

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES

v.

JULIO VIANA



CRIMINAL NO. 05 10203 RWZ

## DEFENDANT'S SUBSTITUTE MEMORANDUM AND REQUESTS UPON SENTENCING

Julio Viana ("Mr. Viana"), through Counsel and in contemplation of his sentencing currently set for May 31, 2006, submits the following Memorandum and Requests for this Court's consideration.

Facts.

Mr. Viana is a Brazilian national who came to the United States in 1990, has been here since that time, and has a record of steady -- virtually uninterrupted -- and gainful employ. He has consistently maintained a friendship and allegiance with the Brazilian communities both in the Commonwealth of Massachusetts and his community of origin in Brazil, where members of his family and many of his friends still reside.

In 2001 or 2002, Mr. Viana began to work at the Family Market in Peabody, Massachusetts, a business owned by his brother, Mario.

Under a license duly issued by the Commonwealth of Massachusetts to either his brother Mario or Mario's wife Sandra, Mr. Viana began to conduct a money remitting business. He operated as an Agent of Uno Money Transfers, a large-scale remittal company, out of the Family Market. The greater Peabody, Massachusetts area contains a large population of Brazilian people engaged in legitimate, gainful employ. A great many of them have family and friends who have remained in their country of birth, and who look to, and rely upon, their relations in this country for financial assistance. There was a need for such a business, and Mr. Viana fulfilled that need. Nearly all of his business

consisted of accepting money – much of it in cash – from local Brazilians and wiring, or otherwise transferring it to the relatives and friends of his constituents in Brazil. For his endeavors, Mr. Viana received a prescribed fee, five dollars plus three percent of the transferred amount.[1] On the fees he took, he paid all required taxes.

The currency which Mr. Viana transferred was all legitimate money. That is, it derived from honest people who were engaged in lawful employ. None of the funds involved in Mr. Viana's business were the fruits of any illegal commerce or enterprise.

On January 6, 2004, the money transmittal license under which Mr. Viana operated was terminated, not on account of any criminal conduct on the part of Mr. Viana or the business, but because of the inability of Uno Money Transfers "to obtain personal information from...Julio Viana, and the high number of returned electronic funds transfers."[2] Nonetheless, Mr. Viana continued to do business. The matter of licensure was not his responsibility, although he does not excuse himself on that basis. The license, however, was reissued on April 7, 2005, from a different company – Vigo Remittance Corporation.

Prior to the time of his arrest, Mr. Viana had been charged in the Boston Immigration Court with "being an alien present in the United States without being inspected and admitted." He conceded the charges and is -- through an Immigration Lawyer -- preparing his applications for relief from deportation. He meets the criteria for such relief, and remains eligible for an Immigration bond for further proceedings in the Immigration Court. Upon the best of Counsel's information and belief, the present convictions do not represent a basis upon which he may be deported. That is, they are not crimes of "moral turpitude" within the meaning of the immigrations laws. Despite the

---

[1]  Of the three percent, 1.5% would go to the transmittal company and 1.5% would go to Mr. Viana and his brother.

[2]  April 26, 2006 Presentence Report, Paragraph 23, ft 1.

instant convictions, Mr. Viana is legitimately eligible to apply for permanent residency status. He and his spouse -- who will be returning to the United States to assist him -- enjoy a loving marriage, which has produced one child. His spouse has been granted permanent residency status in the United States.[3]

On November 9, 2005, Mr. Viana was charged by Indictment with one count of illegal money remitting, and thirteen counts of structuring financial transactions.[4] He pleaded guilty to all counts in which he was named on February 28, 2006.

Argument.

1. The Crimes of "Structuring" and Unlicensed Money Remitting.

31 U.S.C. §5324(a)(3) proscribes "structuring" in connection with transfers involving "one or more domestic financial institutions." Simply put, the Statute does not approve of moving money, currency, by breaking it into increments of ten thousand dollars – or under – per transaction. The Mother Paragraph of §5324 makes it clear that the offensive conduct involves failing to adhere to certain reporting requirements or to be an astute and faithful record keeper where money is implicated..

The impetus of this lawsuit is the Government claim that Mr. Viana acted in violation of the currency transaction reporting laws. Unlike the bulk of structuring cases of which the defense is aware, however, the present matter does not involve criminal activity collateral to the failure to adhere to financial reporting requirements. That is, there is here no suggestion that the subject currency was derived from narcotics activity, that it was the fruit of an organized crime enterprise, that it originated with any criminal fraud scheme, or that it was being "laundered." The Government cannot, and does not, claim that the

---

[3]  See "Exhibit A," annexed hereto. This is an October 17, 2005 letter from Immigrations Attorney Christopher W. Drinan, of the Boston Law Office of John K. Dvorack, P.C., who represents Mr. Viana in his immigration travails.

[4]  18 U.S.C. §1960 and 31 U.S.C. §5324(a)(3), respectively.

subject money was tainted, or is the product of criminal activity. In fact, in the instant case, the remitted money was completely uncorrupted. It represented wholly legitimate wages from wholly legitimate jobs.

When Mr. Viana first became involved in the remittal business, he was informed by one of the institutions he worked with that it would save paperwork and expedite money transfers if the amount of any specific deposit were kept under ten thousand dollars.[5] Hence, It cannot be said that Mr. Viana was unaware of the directive that deposits over a certain amount required particular record keeping. In any event, the practice became routine.

In Ratzlaf v. United States, 510 U.S. 135, 114 S.Ct. 655 (1994) the Court held that the Government must demonstrate not only an intent on the part of an accused to evade a reporting requirement, but also "willfulness," or a knowledge that "structuring" was specifically unlawful. In apparent response to Ratzlaf, "Congress ... amended the statute so that willfulness is no longer required for a violation of 31 U.S.C. § 5324." Aversa v. United States, 99 F.3d 1200, 1206 ft. 4 (1st Cir. 1996), Congressional citation omitted. Hence, since the fact that Mr. Viana harbored no specific malevolent intent no longer affords him a defense, he pleaded guilty to those counts in the Indictment in which he was named.

But the crime of pure "structuring" – unconnected with any other criminal purpose or activity – is a crime without a victim, and a crime without a particularly pernicious harm. In a case of pure structuring, the only real "harm" is the affront to the dignity of the Government's desire to keep tabs on the flow of money in this country. No disrespect is meant by this remark, but a statute prohibiting simple structuring – and naught else – is

---

[5]  It is no secret that financial institutions are perhaps more averse to the reporting requirements than those making deposits. To the institution, reporting represents a somewhat laborious process, and is a banking service for which the bank, or institution, does not get paid.

not necessarily the most defensible Congressional Act of the last three decades. By contrast, Title 26 record keeping requirements are aligned with common sense; without them, the Government would have no mechanism by which to gauge and prove the tax liabilities of individuals and businesses.

The Courts are not without their own observations on the nature of this offense. The Court in Bryan v. United States, 524 U.S. 184, 195, 118 S.Ct. 1939 (1998), citing Ratzlaff, supra, at 510 U.S. 144-145,[6] observed that "[C]urrency structuring is not inevitably nefarious ... [n]or is a person who structures a currency transaction invariably motivated by a desire to keep the Government in the dark." "[I]t is not the purpose of the law to penalize ... innocent errors." United States v. Bishop, 412 U.S. 346, 360-361, 93 S.Ct. 2008 (1973).

The problem of otherwise innocent conduct in the face of sophisticated legislation was contemplated by then First Circuit Chief Judge Breyer in United States v. Aversa, 984 F.2d 493, 502 (1st Cir. 1993), quoted in Bryan, supra, at 524 U.S.195:

> I believe that criminal prosecution for 'currency law' violations ... very much resemble criminal prosecutions for tax law violations. Compare 26 U.S.C. SS 6050I, 7203 with 31 U.S.C. SS 5322, 5324. Both sets of laws are technical; and both sets of laws sometimes criminalize conduct that would not strike an ordinary citizen as immoral or likely unlawful. Thus, both sets of laws may lead to the unfair result of criminally prosecuting individuals who subjectively and honestly believe they have not acted criminally.

---

[6] The Ratzlaf Court observed that there are wholly legitimate instances in which a person may "structure" a transaction without incurring the wrath of the law. It cites, for example, United States v. Isham, 84 U.S. (17 Wall.) 496 (1873), involving the avoidance of payment of a duty. Another example is that individuals may lawfully "gift" money on December 31 and on the following day, in order to avoid gift tax implications during one calendar year. At 510 U.S. 145.

It could not be denied that the Congressional intent underlying the Monetary Transactions Section of the United States Code was to provide a mechanism to aid the interdiction of ignoble criminal conduct. The very preamble -- "Declaration of Purpose" -- to the chapter is unequivocally clear on this point:

> It is the purpose of this subchapter (except section 5315) to require certain reports or records which they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism.

31 U.S.C. §5311.

In its 2001 hearings on Title 31, Congress made certain findings concerning money laundering – a crime of which "structuring" is a frequent element. At 115 Stat 272, 396, Section 302(a)(1), the House found that

> [M]oney laundering, estimated by the International Monetary Fund to amount to between 2 and 5 percent of global gross domestic product, which is at least $600,000,000,000 annually, provides the financial fuel that permits transnational criminal enterprises to conduct and expand their operation to the detriment of the safety and security of American citizens...  .

Section (4) identifies the "root" crimes concerning Congress in its efforts to strengthen Title 31 -- "...ownership and movement of criminal funds, derived from, or used to commit, offenses ranging from narcotics trafficking, terrorism, arms smuggling, and trafficking in human beings, to financial frauds that prey on law-abiding citizens...  ."

After Congress conducted hearings in 2004 on the proposed restructuring of Title 31, it made several findings in support of the new changes. In Pub. L. 108-548, Title VII, §7701, it listed such findings. Section (1) referenced "[t]he global war on terrorism and cutting off terrorist financing." Section (2) also cites "terrorist financing." Section

(3) addresses both terrorist financing and money laundering. Section (4) is a technical statement involving the assessment and alliance of various entities in light of the "Forty recommendations on Money Laundering and the Eight Special Recommendations on Terrorist Financing." Section (5) is a technical statement reflecting an intent to assist the anti-terrorist and money laundering programs in various counties and jurisdictions. Section (6) is a statement concerning training programs for the purpose of fighting terrorism and money laundering. Section (7) is a statement setting goals for the coordination of national and international programs and agencies in the "war" on terrorism and money laundering. Without belaboring the point with further, numerous and similar citations and materials,[7] the defense represents to this Court that the provisions of Title 31, including those sections involving "structuring," were meant as tools to identify, engage, disarm and prosecute a host of offenses which do have victims, and which result in tangible economic harms, violent physical injury to human beings, loss of funds by the United States Treasury, the insidious damages done to persons who are victims -- willing or not -- of the commerce in narcotics and dangerous drugs, and the "legitimization" of racketeering-sponsored schemes through the phenomenon of money laundering. With a modest exercise of imagination, or further Congressional research, this list might be considerably extended.

As to the offense of unlicensed money remitting, the above argument is also applicable. The defense notes that the offense Statute, 18 U.S.C. §1960, falls under the "Racketeering" Section of Title 18. Mr. Viana was clearly not involved in racketeering. Further, the Historical and Statutory Notes contained below §1960 refer directly to certain historical notes contained below 31 U.S.C. §5311. Those notes, under the heading "4-Year Congressional Review; Expedited Consideration," incorporate §1960 by reference as part of the "International Money Laundering Abatement and Financial Anti-

---

[7]    The defense warrants that such materials regarding Title 31 are indeed prolific, and that their interest in combatting terrorism, fraud, narcotics, money laundering and other crimes of moral turpitude is manifest.

Terrorism Act of 2001." Here again, Mr. Viana's offense conduct had nothing whatever to do with international money laundering or fiscal terrorism. Nor, for that matter, were his clients involved in any such activities -- they were family people, with legitimate sources of money.

Mr. Viana has not taken part in even a single one of the infamies recited in the Statutes and historical notes. His aim was to conduct a business for the public good, his actions were consistent with his intent. His clientele were honest working people who were uniformly grateful for his help. Ironically, because he took shortcuts in the conduct of his business, avoided the record keeping prescribed by Statute, and because of a purely administrative[8] -- and temporary -- failure of the remitting license, he now finds himself in the same criminal quagmire in which exist narcotics traffickers, money launderers, racketeers and international terrorists. In terms of his offense conduct level -- 24, before the "acceptance of responsibility" adjustment -- his offense level status is the same as that of a drug dealer who structured narcotics profits, a terrorist who attempted to quietly move money in support of unspeakable acts, a racketeer trying to put an honest business face on an underlying extortion scheme. There is about this something incongruous, something not right, something unjust.

But -- paradoxically in Mr. Viana's case – the law is the law. Having no recourse to a recognized defense to the Indictment, he offered his guilty plea across the board.[9] Yet another irony inherent to this lawsuit is that because he was not involved in "nefarious" activities, Mr. Viana has no "criminal associates" over whom he could "cooperate" with the Government. Hence, a departure recommendation under U.S.S.G. §5K1.1 is an impossibility.

---

[8]  As mentioned elsewhere herein, the remitting license terminated owing to the parent remitting firm's inability to obtain personal information on Mr. Viana.

[9]  It may be perhaps a matter of judicial notice that in this particular District plea bargains are not generally available to persons accused.

Mr. Viana does not deny the relative gravity of his offense conduct. His plea of guilty was the product of a rational and willing mind. He understands that a prison sentence may be an inescapable consequence of his acts. He does, however, ask this Court to recognize and acknowledge that he stands apart from that order of defendants customarily charged with the crime of structuring, that his conduct is not tainted by the perfidious and corrupt conduct which almost always coexists with the offense of structuring.

### 2. The Guidelines Calculus.

From the Probation Department's point of view, the calculation of Mr. Viana's Guidelines offense level was not terribly complicated. The base level for illegal -- unlicensed -- money remitting is 6. Since the money relevant to the offense conduct exceeded $1,000,000, 16 levels are added perforce §2B1.1(b)(1)(I), bringing the level to 22.[10] Additionally – according to the Probation Department – it was necessary to make a two point upward adjustment under §2S1.3(b)(2)(B) because Mr. Viana structured funds in excess of $100,000 in a twelve month period. 24 points in all. 3 points were deducted for acceptance of responsibility, leaving Mr. Viana with a total offense level of 21. His Criminal History Category is I.[11] All told – under the Guidelines – he is exposed to a 37 to 46 month presumptive sentencing range.

----

[10]  §2B1.1 (b)(1), preamble-type language, reads "If the loss exceeded $5,000, increase the offense level as follows...  ." [Emphasis added.] This Section clearly contemplates a victim; there was no victim to Mr. Viana's conduct.

[11]  Mr. Viana has a small handful of motor vehicle offenses, not even enough to budge his criminal history score over zero.

Aside from the fact that Mr. Viana's Guidelines range, as it stands, does no justice for him, the community or this Court [an argument made expanded, infra], there is at least one peculiarity in the calculus of his offense level.  He has been "hit" with two Specific Offense Characteristics.  There was no need for this.

### 3.  Booker.

As this Court knows, under the case of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005), application of the Sentencing Guidelines is no longer mandatory with the Court; although the Court must take the Guidelines into account, they are nonetheless advisory only.  Hence, the sentencing Court has virtually complete discretion in implementing them -- or not implementing them at the disposition of a case.

Some Courts have taken this as license to exceed – for the same offense conduct – a pre-Booker Guidelines sentence.  Other Courts, after consideration of the principles of 18 U.S.C. §3553, have seen fit to undercut the Guidelines, sometimes substantially, in pursuit of rational sentences.

"Booker's remedial solution makes it possible for courts to impose non-guidelines sentences that override the guidelines, subject only to the ultimate requirement of reasonableness."  United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir., March 9, 2006).[12]

### 4.  18 U.S.C. §3553.

In the aftermath of Booker, 18 U.S.C. §3553 has, appropriately, taken on far more significance than that invested in it before.[13]  That is, "individualized" sentencing is more the mandate than is "sentencing by the numbers."

---

[12]  To the defense' knowledge, official reporter pagination is not yet available.

[13]  The Booker Court "excised" from §3553 that portion of it which required the Courts to follow the Guidelines at sentencing.

> [A] court's explanation of its sentence [and, *a priori*, the sentence itself] must 'sufficiently show a thoughtful exercise of the court's sentencing responsibility and a degree of care and individualized attention appropriate to the solemnity of the sentencing task.' United States v. Vazquez-Molina, 389 F.3d 54, 59 (1st Cir. 2004), cert. granted, judgement vacated, and case remanded on other grounds, 125 S.Ct. 1713 (2005).

Jimenez-Beltre, at 440 F.3d —.  Consideration of a defendant himself or herself — apart from the Guidelines — was, then, a mandatory factor before Booker liberated the Courts from hide-bound adherence to the Guidelines and before §3553 was restructured to eliminate the necessity for such adherence.

The Jimenez-Beltre Court,[14] quoting at some length from Booker, went on to give further meaning to the conceptual -- and operational -- factors inherent in post-Booker sentencing:

> Many commentators argue that by giving the guidelines controlling weight and abdicating the responsibility to take account of the other section 3553(a) factors, courts "effectively mak[e] the guidelines as binding as they were before Booker," thereby violating Booker's constitutional command.  Mccolgin & Switzer, *supra*. At 53; see also Frank O. Bowman, III, Beyond Band-Aids:  A Proposal for Reconfiguring Federal Sentencing After Booker, 2005.
> U. Chi. Legal F. 149, 183 (2005).  Justice Stevens made a similar point in his dissent in Booker, stating that the "sentencing range is now nothing more than a suggestion that may or may not be persuasive to a judge when weighed against the numerous other considerations listed in [section 3553(a) ]." 243 [sic] U.S. at 300, 7 S.Ct. 273 (Stevens, J., dissenting in part).  Justice Scalia wrote to the same effect, stating that "logic compels the conclusion that the sentencing

---

14    Jimenez-Beltre is as comprehensive a decision on post-Booker sentencing as the First Circuit has handed down, in the opinion of the defense.

judge, after considering the recited factors (including the Guidelines), has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range.
If the majority thought otherwise ... its opinion would surely say so." Id. at 305, 37 S.Ct. 273 (Scalia, J., dissenting in part).  To be sure, these are dissents to the remedial decision in Booker, which does not elaborate on its statement that the guidelines must be "consider[ed]" post-Booker. But given the close divisions on the Court about the post-Booker role of the guidelines, and given the new composition of the Court, it would be foolhardy to ignore the constitutional dangers of adopting an approach to the guidelines post-Booker that approximates, in a new guise, the mandatory guidelines.

At 440 F.3d ___, emphasis supplied.  There is no ambiguity whatever to this language; there is nowhere a clearer directive on the meaning of Booker and the adherence to the principles of the "new and improved" §3553.  Sentencing Courts are once again with the authority to take into account at sentencing factors which the Guidelines had previously discouraged or, worse, prohibited altogether.

The Sentencing Guidelines, as created, were exceptionally parsimonious concerning features of a case which might take it out of the "heartland."  Indeed, in its history of hundreds of Amendments and revisions, it has become more miserly in such regard.  Post-Booker, this is no longer an obstacle.  Mr. Viana and his conduct, for example, are simply not in the "heartland" of international terrorists, narcotics traffickers, racketeers and the like.  The defense assigns that – effectively – there is no "heartland" at all for pure structuring offenses which aggrieve no victim, and visit no harm, societal or individual.   Even under the pre-Booker status of the Guidelines, Mr. Viana's offense conduct comprised a group of regulatory transgressions, wholly devoid of any connection to the overarching Congressional

meaning for §§1960 and 5324(a)(3). That is, his conduct was atypical within the
contemplated sense of the Statutes and therefore not within the
" 'heartland' for which the applicable guideline was designed." <u>United States</u> v.
<u>Roselli</u>, 366 F.3d 58, 67 (1st Cir. 2004), quoting from <u>United States</u> v. <u>Carrion-
Cruz</u>, 92 F.3d 5, 6 (1st Cir. 1996). See also, generally, <u>Koon</u> v. <u>United States</u>,
518 U.S. 81, 116 S.Ct. 2035 (1996), the case which arguably broadened a
sentencing Court's reach over "non-heartland" factors.

 But in this post-<u>Booker</u> world, 18 U.S.C. §3553 virtually trumps the
Guidelines. Under §3553(a), a sentencing Court is obliged to "... impose a
sentence sufficient, but not greater than that necessary to comply with the purposes
set forth in paragraph 2 of this subsection." The mandatory nature of the Section's
language carries more force, weight and latitude than do the advisory Guidelines. It
is also incumbent upon a Court to set a "reasonable" sentence, taking into account
the factors recited in §3553. Those factors include "the nature and circumstances
of the offense and the history and characteristics of the defendant." Mr. Viana's
offenses were administrative, and he himself has been historically neither morally
distorted nor criminally inclined.[15]

 Other pertinent factors, at least as the defense perceives them, are
traditional precepts of sentencing law: "just punishment," "deterrence," and the
protection of the public from "further crimes of the defendant." Mr. Viana
concedes the need for punishment because -- after all -- he has violated provisions
of the laws of the United States. He submits that what is "just," however, falls far
below the Guidelines range of 37 to 46 months. The interests of justice are no
better served by incarcerating him for three to four years than they are by a lesser
sentence. The same argument applies to the factors of generic deterrence and

---

[15] But for the motor vehicle offenses.

personal deterrence. Mr. Viana simply does not represent a menace to society, and a lesser sentence would amply serve as fair warning to those who were inclined to the same conduct.

This Court must also take into account "the kinds of sentences available." Since both Statutes of conviction provide non-mandatory prison terms of anywhere up to five years, the Court may impose a sentence within that broad range, including a probated sentence. Once again, because the Guidelines are advisory, this Court may, upon its reason, sentence anywhere below the Guidelines range.

Defense Counsel has taken careful, at length consideration of all the information available to him; has taken into account his experience in sentencing matters and the particulars of the instant case; and has conducted an analysis under the law of sentencing possibilities. Counsel suggests to this Court that the appropriate Guidelines offense level is 10. This falls within Zone B of the Sentencing Table, and provides a six to twelve month sentencing range. For offense levels within Zone B, the Court can impose an incarceration with the range. Alternatively, the Court can order a modified term of probation if

> the applicable guideline range is in Zone B of the Sentencing Table and the Court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention as provided in subsection (c)(3) of §5C1.1 (imposition of a term of imprisonment).

U.S.S.G., §5B1.1(a)(2).

§3553(a)(2)(D) contains yet another factor which may have application in this case :"[t]o provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."[.] In the present case, the Defendant can certainly benefit from intensive lessons in civics and respect for the law, including those of a regulatory nature. The

defense believes that Mr. Viana will be susceptible to corrections, particularly with his Wife nearby to reinforce a change in attitude.

To impose a sentence of greater length than that suggested would be simply to "warehouse" Mr. Viana, and permit of the "institutionalization" which befalls many long-term prisoners. If such became the case with the Defendant, the purposes of successful sentencing would be ultimately defeated. Once again, a sentence must also be "reasonable." United States v. Webb, 403 F.3d 373, 383 (6th Cir. 2005).

5. Conclusion.

Mr. Viana knows that this Court will sentence him in reflection of the seriousness of the offense, but hopefully in proportion to it.

This Court has heard the evidence concerning the Defendant's conduct. He acknowledges the impact of his conviction.

Even though he recognizes the gravity of his offense conduct, Mr. Viana nonetheless asks this Honorable Court to temper justice with mercy. That quality, in this day of "law and order," seems to have been sidelined, if not altogether abandoned. Even so, the "discretion to be compassionate or harsh is inherent in the sentencing scheme." Garner v. Jones, 529 U.S. 244, 258 (2000), emphasis supplied. "[W]e see in the sentencer's expression of mercy a distinctive feature of our society that we deeply value." California v. Brown, 479 U.S. 538. 562, 107 S.Ct. 837 (1987) [dissenting Opinion of Justices Powell and Stevens].

This Court can exercise compassion, mercy, toward the Defendant without abdicating its responsibility to society. Indeed, as the letters on behalf of the Defendant will show, there are voices in the very society the law seeks to protect which speak for the Defendant and ask for compassion.

)                                              )

The Defendant, even in light of his offense conduct, is not a man who is below the mercy and compassion of this Court. He asks the humanity of this Court.

ORAL ARGUMENT IS REQUESTED.

/s/ Roger Witkin
ROGER WITKIN
BBO #531780
6 Beacon Street, Suite 1010
Boston, Massachusetts   02108
(617) 523-0027 (tel.)
(617  523-2024 (fax)

DATED: May 15, 2006

16

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

UNITED STATES

V.                                    CRIMINAL NO. 05 10203 RWZ

JULIO VIANA

### CERTIFICATE OF SERVICE

I hereby certify that on this day a courtesy copy of the within documents were served upon AUSA Nadine Pellegrini, U.S. Attorney's Office, 1 Courthouse Way, Suite 9200, Boston, MA 02210 and Geoffrey G. Nathan, Esq. 90 Quincy Shore Drive, Suite 705, Quincy, MA 02171, by mail and electronic filing, which was e-filed this day.

/s/ Roger Witkin
Roger Witkin
6 Beacon Street, Suite 1010
Boston, MA 02108
Tel. 617 523 0027
Fax 617 523 2024
BBO No. 531780

DATE: May 15, 2006

# EXHIBIT "A"

# LAW OFFICE OF JOHN K. DVORAK, P.C.

ATTORNEYS AND COUNSELLORS AT LAW

P.O. BOX 8788    •    180 CANAL STREET    •    BOSTON, MA 02114    •    (617) 723-1899    •    FAX (617) 723-8305

John K. Dvorak
Christopher W. Drinan
Susan Zak

17 October 2005

Roger Witkin, Esq.
6 Beacon Street
Boston, MA 02108

      RE:  VIANA, Julio
            A78 – 315 – 173

Dear Attorney Witkin:

I am responding to your request for an update regarding the Immigration status of our mutual client Julio Viana.

Mr. Viana is currently in removal (deportation) proceedings before the Boston Immigration Court. These proceedings were instituted before Mr. Viana's recent arrest on criminal charges. Mr. Viana is charged with being an alien present in the United States without being inspected and admitted (i.e. illegal entry). These charges were conceded at a prior hearing, and Mr. Viana was found to be removable from the United States by the Immigration Judge. Mr. Viana was then granted a continuance to prepare his applications for relief from deportation.

Mr. Viana is seeking to apply for permanent resident status in the U.S. based on:

1)      Cancellation of Removal – An alien unlawfully present in the United States can seek to apply for permanent residency if: (a) he has been physically present in the United States for ten (10) years, excepting short absences, and; (b) he has a U.S. citizen or lawful permanent resident spouse, parent or child who would suffer extreme hardship as a result of the alien's deportation. Mr. Viana meets the threshold requirements for this form of relief.

2)      Permanent Residency as a Derivative Beneficiary of his Spouse's Application – Mr. Viana's spouse was previously granted permanent resident status as a result of an immigrant visa petition filed by her employer. Mr. Viana is eligible to apply as a derivative beneficiary of her application.

Mr. Viana was scheduled for a hearing on his applications for relief on August 12, 2005. Unfortunately, he had been arrested before this date, and the hearing could not go forward in his absence. Because of the impossibility of conducting a hearing on Mr. Viana's applications without his presence, the case has been "administratively closed" by the Immigration Court (this merely means that the case has been removed from the Court's active docket – it can be recalendared on the motion of either party should Mr. Viana become available to attend a hearing).

Based on my analysis of the situation, Mr. Viana would remain eligible to apply for his permanent residency, even in the case of a conviction on the charges at issue. The Board of Immigration Appeals has previously held that 31 U.S.C §5324(a)(3) (structuring transactions) does not constitute a "crime involving moral turpitude", and therefore is not a conviction resulting in deportability or inadmissibility. (See In re L-V-C, Int. Dec. No. 3382 (BIA 1999)). The BIA has apparently not specifically ruled in regard to 18 U.S.C. §1960 (unlicensed money remitting). However, I expect that this will likewise be considered a "regulatory" offense, and thus not to constitute a crime of moral turpitude. However, the applications filed by Mr. Viana are subject to the discretion of the Immigration Judge, who is free to consider any convictions as negative equities in regard to his decision on the case.

Mr. Viana is also eligible for an Immigration bond, as he has not been convicted of any crimes that would place him in a "mandatory detention" category. Likewise, even assuming a conviction on the charged offenses, he should remain eligible for an Immigration bond, as the charged offenses are not crimes of moral turpitude, nor do they fall into the category of offenses that implicate the mandatory detention criteria. Of course, any determination in regard to bond is within the discretion of the Immigration Judge, who can impose whatever conditions he sees fit to compel attendance to future hearings. However, Mr. Viana is, in my opinion, eligible for release under such conditions.

Please feel free to contact me if you have any further questions.

Sincerely

Christopher W. Drinan, Esq.
(617) 723-7836
cdrinan@johnkdvorak.com

District of Massachusetts Versio~ ?.5                                      Page 1 of 1

## Other Documents
1:05-cr-10203-RWZ USA v. Viana et al

### United States District Court

### District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Witkin, Roger entered on 5/15/2006 at 10:28 AM EDT and filed on 5/15/2006

**Case Name:**           USA v. Viana et al
**Case Number:**         1:05-cr-10203
**Filer:**
**Document Number:** 38

**Docket Text:**
Memorandum regarding Sentencing as to Julio Viana (Witkin, Roger)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=5/15/2006] [FileNumber=1425632-0
] [8a6bf1cb1fcc7f7ecfdc796308b2376a80855fccf624687bd66ed850ceecd010f96
5e5632ce47c726216679dd4939f4315611d8555fc225ca76c2c3a9441250b]]

**1:05-cr-10203-2 Notice will be electronically mailed to:**

Geoffrey G. Nathan      Nathanlaw@earthlink.net

Nadine Pellegrini      nadine.pellegrini@usdoj.gov, usama.ecf@usdoj.gov

Roger Witkin      roger@rogerwitkin.com

**1:05-cr-10203-2 Notice will not be electronically mailed to:**